NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 21-117

STATE OF LOUISIANA

VERSUS

JOSEPH MICHAEL ELIE, III

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 341,833
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

BILLY H. EZELL
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy H. Ezell, John E. Conery, and Van H. Kyzar, Judges.

CONVICTION AFFIRMED; SENTENCE
AMENDED; REMANDED WITH
INSTRUCTIONS.

**J. Phillip Terrell, Jr.**
**District Attorney**
**Catherine L. Davidson**
**Assistant District Attorney**
**Ninth Judicial District**
**P.O. Box 7358**
**Alexandria, LA 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Joseph Michael Elie, III**

**Joseph Michael Elie, III**
**River Bend Detention Center**
**9450 Hwy 65 South**
**Lake Providence, LA 71254**

**EZELL, Judge.**

On April 9, 2019, Defendant, Joseph Michael Elie, III, was charged by bill of information with one count of aggravated arson, in violation of La.R.S. 14:51; as well as one count of attempted aggravated arson, in violation of La.R.S. 14:27 and La.R.S. 14:51. Trial on count one began on March 4, 2020, and Defendant was convicted of aggravated arson on March 5, 2020.

Prior to trial on March 2, 2020, the trial court held a hearing on a motion to introduce other crimes evidence filed by the State seeking to introduce evidence of a second-degree battery conviction against the same victim, three prior arrests for arson-related crimes, and threatening communications between Defendant and the victim. The trial court ultimately ruled the State could not introduce the Defendant's 1994 arson-related arrest but could introduce arrests from 2006 and 2018, as well as the second-degree battery conviction. The trial court also held the admissibility of any communications would be decided individually prior to introduction of said communications.

On September 17, 2020, the trial court sentenced Defendant to twenty years at hard labor without benefit of probation, parole, or suspension of sentence for at least the first two years. The court ordered this sentence to run consecutively with Defendant's seven-year sentence in trial court docket number 341,833. On October 20, 2020, the State filed a habitual offender bill, charging that Defendant should be adjudicated a second felony offender and sentenced as such. According to information obtained from the Rapides Parish Clerk of Court's Office on October 1, 2021, no action has been taken on the habitual offender bill.

Defendant now seeks review of his conviction for aggravated arson, contending (1) the State failed to prove that he was the person who set the victim's

home on fire and (2) the trial court erred in allowing other crimes evidence related to two prior arrests for arson, neither of which resulted in convictions. Additionally, Defendant has raised three pro se assignments of error alleging insufficient evidence to convict and two ineffective assistance of counsel claims. Defendant also submitted a supplemental brief which raises the same claim as his second counseled argument.

**FACTS**

As Defendant has challenged the sufficiency of the State's evidence regarding identifying Defendant as the perpetrator, we will discuss the trial testimony in detail. The State's first witness was Ms. Jasmine Duncantel, the victim and Defendant's former girlfriend. Ms. Duncantel testified that she previously lived at a house located at 2423 Madeline Street in Alexandria, Louisiana. She stated she had lived there for roughly ten years prior to the house being set on fire.

Ms. Duncantel testified that she had lived in the house with her father, Mr. Oscar Cheatham, and her two daughters, the younger of which is the Defendant's child. She stated that on January 13, 2019, she met Defendant briefly at the corner by her house, noting her father did not approve of Defendant and Defendant was therefore not allowed to be at her house. Ms. Duncantel testified she did not remember what time she met Defendant, but that it was during the night. She testified that although she told Defendant she would try to come back outside, she had no intention of doing so because Defendant was giving off a wrong vibe and because she had a three-month-old child.

According to Ms. Duncantel, she returned inside, turned off her cellphone, and unplugged the home phone so Defendant could not bother her before lying

2

down in her bed with her daughters and falling asleep. She testified her older daughter woke her up because Defendant was outside knocking on her window. While trying to get Defendant to leave, the glass in the window broke. She testified she recognized Defendant's voice and that he called her by name, trying to get her to meet him outside. Ms. Duncantel stated that she did not want to go outside because she was scared of Defendant, claiming he has an "alter ego" and that he has hurt her previously.

The State then used Ms. Duncantel to introduce State's Exhibits 2-5, all of which are messages Ms. Duncantel claimed Defendant sent her after the fire which included numerous threats from Defendant that he was going to kill her. The State then had Ms. Duncantel play multiple voice messages from her phone that she received from Defendant on January 8, 2019. The messages were full of death threats stating Defendant would kill Ms. Duncantel the first chance he got and that it was his "mission in life to hunt [her] down like the dog mother-fucker [she] is and treat [her] like the dog mother-fucker [she] is."

Ms. Duncantel testified that on the night of the fire, she called law enforcement at her father's request after Defendant broke her window. After law enforcement came and took a report, Ms. Duncantel testified she called again because her father saw "someone around the house." She stated law enforcement did not arrive a second time until after the house was set on fire.

Regarding the fire, Ms. Duncantel testified that "it felt like an earthquake or something had shook the house," and that she, her daughters, and her father escaped to her daughter's room, where her father, Mr. Cheatham, broke out the window and they escaped the house. Ms. Duncantel then noted that an ambulance arrived alongside fire trucks and the whole family was examined in the ambulance.

On cross-examination, Ms. Duncantel acknowledged that she and Defendant, between the January 8, 2019 threats and the January 13, 2019 fire, spoke multiple times and that their conversations frequently ended in arguments with mutual cursing and use of derogatory names. She testified that she was not clear on the exact time she met Defendant at the corner of the home, when he broke the window, or when she called law enforcement. She also acknowledged that she did not see who started the fire. Defense counsel then submitted a collection of messages from Defendant's phone the day before the fire leading up to the time of the fire. She again testified that she was unaware of the time frame between when she called law enforcement after Defendant broke her window and when the fire started and that she did not see Defendant start the fire.

The State then called Mr. Edward Beckham, the Chief Investigator for the Rapides Parish District Attorney's Office. Mr. Beckham noted he had been with the DA's Office for twenty-five years, prior to which he spent twenty-two years at the Alexandria City Police Department and retired as a Lieutenant. The State admitted State's Exhibit 6, a recording of the threatening messages previously played from Ms. Duncantel's phone. Mr. Beckham noted there were no specific threats to burn down the victim's house.

The State then called Mr. Oscar Cheatham, Ms. Duncantel's father. On the night of the fire, Mr. Cheatham was asleep in the front room of the house when he was awoken by "somebody beatin' on the window in the bedroom next door." Mr. Cheatham testified he asked his daughter, who was at her window, and she said her boyfriend, Defendant. Mr. Cheatham testified law enforcement was called after Defendant broke the window. He testified Defendant returned after law enforcement left; his daughter called law enforcement again, but they did not

return.  Mr. Cheatham stated he was in the front room when something was thrown through the front window, starting the fire.  He stated he was in the hallway while his daughter and grandchildren were in the back room until they said they could not breathe, so he busted out a window and helped them exit the house.

Although Mr. Cheatham repeatedly asserted that Defendant left when law enforcement arrived then returned once they left, he acknowledged that he did not see Defendant, stating all he saw was a shadow outside the house.  Mr. Cheatham concluded his cross-examination by stating his neighbor told Mr. Cheatham "that he started throwing bottles in the house."

The State then called Mr. Reginald Hebert, a Fire Prevention Officer with the Alexandria Fire Department, a position he had held for five years after seven years as a fire fighter.  He testified that as a Fire Prevention Officer, he was trained to investigate crime scenes to determine how a fire started, how it spread, etc.  The State then went through a series of post-fire photographs taken by Mr. Hebert, introduced on a disc as State's Exhibit 8.

Mr. Hebert testified that he obtained multiple 911 calls that were made reporting the fire around 3:23 a.m.  He stated he developed Defendant as a suspect based upon messages from Ms. Duncantel's phone, speaking with Mr. Cheatham, and a records search that showed Defendant was arrested as a suspect in two prior fires in 2006 and 2018.  Mr. Hebert noted he obtained search warrants for phones involved in the case.  He noted the warrants were for phones belonging to Defendant and Ms. Rakeisha Collins based on information Defendant had Ms. Collins's phone on the night of the fire.  Based upon the information obtained from Ms. Collins's cellphone and information obtained as a result of search warrants for the provider, Mr. Hebert produced a timeline of where the cellphone was located

between 1:38 a.m. and 4:43 a.m. on the morning of the fire, which was introduced as State's Exhibit 18, which we have summarized:

> At 1:38, the phone is near the intersection of Jackson and Chester Streets in Alexandria, Louisiana. At 1:50, the phone leaves the area heading south on MacArthur Drive before heading south on Highway 71 by 1:53. By 2:42, the phone is near the intersection of Ford and Hardy Streets in Lecompte, Louisiana. By 2:48, the phone is travelling back towards Alexandria. At 3:02, the phone is near Interstate 49 and Sugar House Road. By 3:13, the phone is located within a 1500-meter-wide circle that includes 2423 Madeline Street. The fire department was dispatched to 2423 Madeline Street at 3:24, at which time the phone was still inside a 1500-meter-wide circle that included 2423 Madeline Street. The phone was then travelling south on Interstate 49 by 3:27 and was in Lecompte, Louisiana, by 4:04 a.m.

Mr. Hebert testified that shortly before the fire, Defendant was near the home and was still near it when the fire department was dispatched to the fire.

Mr. Hebert acknowledged that the timeline initially given to him by Ms. Duncantel placed Defendant at her house between 2:00 and 3:00 a.m., which would not fit the timeline of where Ms. Collins's phone was located. He also acknowledged there was no forensic evidence that tied Defendant to the fire but noted that most forensic evidence such as DNA or fingerprints would have been destroyed by the heat of the fire. Mr. Hebert testified that no one inside the house told him they saw the person who knocked on the window after law enforcement left the home the first time and when the fire started or who threw the device which started the fire. Mr. Hebert also acknowledged that Ms. Collins's home was also within the 1500-meter-wide circle where the phone was located immediately prior to the fire and that Ms. Collins had indicated Defendant was with her part of the night. Mr. Hebert also testified that in addition to the fire, fire suppression activities can also destroy evidence, noting the firefighting foam they sometimes use actively breaks down ignitable liquids.

6

The State then called Mr. Samuel Allen, a Fire Prevention Officer for the Alexandria Fire Department since 2009. Mr. Allen testified that he investigated an attempted arson at Ms. Duncantel's residence on Madeline Street on September 10, 2018. He noted there was a strong smell of gasoline as soon as he exited the car and there were torn sheets running from the backyard to the storage room of the residence that resembled a wick. He testified neither Ms. Duncantel nor her father knew how the wick had appeared. Mr. Allen noted there was no forensic evidence or eyewitnesses who could identify Defendant as being at Ms. Duncantel's house regarding the 2018 incident but noted Defendant's phone records placed him near the house that night, though earlier than when Ms. Duncantel stated she saw someone outside.

The State's next witness was Mr. Alex King, a forensic chemist from the North Louisiana Crime Lab who was accepted as an expert in Forensic Chemistry. Mr. King stated the evidence submitted to him was not found to have any ignitable liquid but noted the Alexandria Fire Department uses an enzymatic foam that destroys ignitable liquid. The State then rested its case.

Defense counsel rested without producing any witnesses then argued in closing that Defendant should not be convicted because the State could not place him at the crime scene based on no one seeing him start the fire and the fact that his other girlfriend's home was also in the area where Defendant was located at the time the fire started.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent involving the sentence imposed.

The trial court incorrectly stated the number of years that Defendant must serve without the benefit of parole, probation, or suspension of sentence. The penalty provision for La.R.S. 14:51 requires two years of the sentence to be served without benefit of parole, probation, or suspension of sentence. The trial court, however, stated that "at least" two years of Defendant's twenty-year sentence must be served without the benefit of parole, probation, or suspension of sentence. In another case wherein the trial court incorrectly stated the portion of the sentence that had to be served without benefits, this court stated the following:

> We have reviewed the record and find one error patent on the face of the record. The sentence for an armed robbery conviction must be served without benefit of probation, parole, or suspension of sentence. La.R.S. 14:64. When the trial court sentenced Thibodeaux to thirty years at hard labor, the court failed to state that the sentence would be served without benefit of probation, parole, or suspension of sentence. Ordinarily, the Defendant's sentence would be deemed to contain the mandatory parole restriction pursuant to La.R.S. 15:301.1, and no action by the court would be necessary. However, at the conclusion of the sentencing hearing, the trial court stated:
>
>> You will be eligible for parole in the old case at half. You will not be eligible for parole in this case until eighty-five percent. That, I know. And that is one of the reasons why it is only thirty. Because at least you will be required to served eighty-five percent of the time that you have in this sentence.
>
> The trial court mistakenly advised the Defendant he would be eligible for parole. When the trial court is silent as to the required term of parole ineligibility, La.R.S. 15:301.1 obviates the need to correct a sentence. See *State v. Rivers,* 01–1251 (La.App. 5 Cir. 4/10/02), 817 So.2d 216, *writ denied,* 02–1156 (La.11/22/02), 829 So.2d 1035. However, in this case, the trial court was not silent and advised the Defendant incorrectly. In such cases, an appellate court is bound to correct the sentence rather than rely on La.R.S. 15:301.1(A). *See State v. Sanders,* 04–0017 (La.5/14/04), 876 So.2d 42, where the supreme court held when a trial court imposes benefit restrictions beyond that authorized by statute, an appellate court should correct a sentence rather than rely on La.R.S. 15:301.1(A). Therefore, we hereby correct Thibodeaux's sentence to reflect his term of imprisonment shall be served without benefit of probation, parole, or suspension of sentence in accordance with the statute.

*State v. Thibodeaux*, 05-680, pp. 3-4 (La.App. 3 Cir. 12/30/05), 918 So.2d 1093, 1094-95.

Likewise, Defendant's sentence is amended to reflect the correct number of years required by La.R.S. 14:51 to be served without benefit of parole, probation, or suspension of sentence—two years. Additionally, the trial court is instructed to make an entry in the court minutes and on the commitment order reflecting this change. *See State v. Ayala*, 17-1042 (La.App. 3 Cir. 4/18/18), 244 So.3d 519.

## ASSIGNMENT OF ERROR NUMBER ONE

In both his first counseled assignment of error and his first pro se assignment of error, Defendant contends the evidence was insufficient to support his aggravated arson conviction; specifically, Defendant contends the evidence failed to establish that he was the person who set the fire at 2423 Madeline Street. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009 (alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04–1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

Because no witness was able to affirmatively state they saw Defendant set the fire, his involvement must be proven by circumstantial evidence. Under La.R.S. 15:438, "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The Louisiana Supreme Court has previously noted:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. Davis*, 92-1623, p. 11 (La. 5/23/94), 637 So.2d 1012, 1020, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450 (1994).

The argument from both Defendant and appellate counsel is that the evidence presented was insufficient to prove Defendant was at 2423 Madeline Street when the house was on fire. Defendant appears to argue that because Ms. Collins's home was in the same vicinity as Ms. Duncantel's home, the fact the phone he was carrying was in that area is irrelevant. Despite Defendant's

dismissal of the phone-location data, the evidence was before the jury and established that shortly before the fire began, and at the time 911 was called, Defendant was within a mile of the fire. Furthermore, the phone-location data also showed that at 3:27 a.m., within three minutes of 911 being called regarding the fire, Defendant was on the Interstate heading back towards Lecompte, Louisiana. Additionally, the jury heard multiple voice messages in which Defendant threatened to kill the victim less than a week before the fire and were informed of two of Defendant's prior arrests for arson-related crimes, including an attempted aggravated arson at 2423 Madeline Street less than a year before the fire involved in the instant case. Although the propriety of introducing those arrests is the subject of a subsequent assignment of error, they were introduced before the jury and therefore are part of the *Jackson* evaluation.

Defendant and appellate counsel contend the State failed to disprove the reasonable hypothesis that someone else set the fire at Ms. Duncantel's home. When viewed in the light most favorable to the prosecution, the evidence presented is sufficient to support Defendant's conviction. The hypothesis is based on Ms. Duncantel's description of events, particularly her claims regarding what time the events took place. For example, Defendant claims he could not have been the person Ms. Duncantel stated she saw creeping around the house after law enforcement left because that would have been around 2:00 a.m., and he had "met his girlfriend at another location at 1:38 A.M. and travelled to Lecompte, La." Although Defendant is correct that phone-location data puts him at the corner of Jackson and Chester Streets at 1:38 a.m., we find that intersection is only about five blocks from Ms. Duncantel's home. Additionally, trial counsel went to great

lengths to note that Ms. Duncantel's given times fail to match up with the evidence presented at trial such as the text messages from the night of the fire.

Given that Ms. Duncantel's time frames were clearly inaccurate, the jury could have simply disregarded the portion of her testimony that did not make sense chronologically. Additionally, the text messages between Defendant and Ms. Duncantel fail to establish exactly when the window was broken because there is no time stamp on the messages, either in State's Exhibit 2 or Defense Exhibit 1. Based on State's Exhibit 2, Defendant had to have broken Ms. Duncantel's window sometime before 2:41 a.m. based upon a missed call after the argument over the window.

Ultimately, the jury was presented with evidence that Defendant had previously threatened to murder the victim, had previously been arrested for attempted aggravated arson against the victim as well as another prior arson offense, that Defendant had definitely been at the victim's house on the night of the fire, and that Defendant drove back to Alexandria from Lecompte at 3 a.m. only to drive back to Lecompte thirty minutes later, approximately three minutes after neighbors reported Ms. Duncantel's house was on fire. Although Defendant is correct that no one testified they saw him actively set the fire to the house, we note that Louisiana courts have upheld identification of a defendant in arson cases based upon proximity and animosity.

In *State v. Combs*, 600 So.2d 751 (La.App. 2 Cir.), *writ denied*, 604 So.2d 973 (La.1992), the second circuit found sufficient evidence to identify the defendant after individuals testified they saw him near the location of the fire prior to its ignition and witnesses testified the defendant had threatened to burn the victim's home. Likewise, this court in *State v. Richard*, 18-521 (La.App. 3 Cir.

2/6/19), 265 So.3d 1058, upheld the identification of the defendant based upon him being seen in the area of a residential fire less than thirty minutes before the fire and his animosity towards the victim, an ex-girlfriend he had threatened after she did not spend the night at home. Despite alibi witnesses who testified Defendant was somewhere else prior to the fire, this court upheld the identification under *Jackson*.

Given the evidence presented to the jury, particularly the animosity apparent in Defendant's voice mails and text messages to the victim and the fact the fire occurred during a thirty-minute window of when he was back in Alexandria near the home according to phone-location data, we believe a reasonable juror could have found the State proved Defendant set the fire, despite there being no witness to identify him. Defendant does not contest that the State proved an aggravated arson occurred, only that he was the person who started the fire. Accordingly, this court has only evaluated the evidence related to Defendant's identity as the firestarter and find this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO**

In Defendant's second counseled assignment of error, which Defendant also raised in a pro se supplemental brief, he contends the trial court erred in allowing the State to introduce evidence of two of his prior arrests for arson-related offenses. We find there were two notices of intent to introduce evidence under La.Code Evid. art. 404(B) filed prior to trial, one on February 19, 2020, and the other on February 21, 2020. The State initially noted its intention to introduce evidence of Defendant's conviction for second degree battery on Ms. Duncantel on September 9, 2018; voicemails Defendant left threatening to murder Ms. Duncantel prior to the arson; and Defendant's prior arrests for simple arson in 1994

13

and aggravated arson on October 20, 2006, to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident in the commission of the instant crimes." We find that, at the time, Defendant was still charged with both the January 13, 2019 aggravated arson and the September 10, 2018 attempted aggravated arson. The States' second notice set forth that it intended to introduce evidence of the 2018 attempted aggravated arson during the trial of the 2019 aggravated arson as the investigations overlapped and the investigators conferred due to the victim and location being identical. The evidence was intended to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident in the commission of the instant crime." In a subsequent memorandum, the State contended discussion of the September 2018 battery and attempted aggravated arson were important factors used by investigators to reach the conclusion that Defendant was a suspect in the January 2019 fire. The State also argued Defendant's prior arrest for aggravated arson in 2006 was a major factor in the investigation of the instant aggravated arson.

A hearing was held on the admissibility of the above evidence on March 2, 2020. There, the State again argued the September attempted aggravated arson, occurring the day after Defendant committed a battery against Ms. Duncantel which resulted in a conviction for second degree battery, was vital to the investigation of the instant arson as the victim and location are the same. The State acknowledged it had no intention of going into the details of the incidents other than acknowledging they occurred as part of the investigative process of the instant offense. The State also noted that it wished to introduce Defendant's October 20,

14

2006 arrest because it was on Defendant's rap sheet and was a factor in the fire investigators' process.

Defense counsel argued the information that led to Defendant's arrest for the attempted aggravated arson was insufficient to prove he committed the crime, as the victim said she saw a shadow and smelled gasoline, and the next morning what Mr. Allen described as a wick leading up to the home was found. The trial court ruled the attempted aggravated arson arrest was "admissible because of the connexity between the victim and the property and the connexity in time[.]" The trial court also ruled that, under *State v. Eisbruckner*, 96-252 (La.App. 5 Cir 1/15/97), 688 So.2d 39, *writ denied*, 97-429 (La. 9/5/97), 700 So.2d 502, the 2006 aggravated arson arrest was admissible "for the purpose of showing the wilful intent." In *Eisbruckner*, the defendant was facing a charge of second degree murder wherein the victim died of asphyxiation during an aggravated arson. The fifth circuit upheld the introduction of two prior fire-related offenses and a threat by the defendant to burn down a building. Despite the two prior convictions being more than a decade old at the time of the fire in question, the court found they were relevant to prove the defendant had a penchant to set fires when he was angry.

Defendant contends the State should not have been allowed to introduce evidence of his arson-related arrests in 2006 and 2018 because the State used a boilerplate recitation of all the grounds other crimes evidence may be allowed under La.Code Evid. art. 404(B)(1). This argument is based upon *State v. Taylor*, 16-1124, 16-1183 (La. 12/1/16), 217 So.3d 283. There, the supreme court expressly stated, "Accordingly, the state cannot simply rely on a boilerplate recitation of the grounds for admissibility stated in La. C.E. art. 404(B). It is the duty of the district court in its gatekeeping function to determine the independent

15

relevancy of this evidence." *Id.* at 292. While we agree the State should not simply use boilerplate language to claim other crimes evidence is admissible for every reason possible, this court is unaware of any instance where a court vacated a conviction based solely on the State's failure to be specific about its use of other crimes evidence, particularly given that a contradictory hearing was held to discuss the issue. Furthermore, in *Taylor*, the court actually found no error in the trial court's ruling that other crimes evidence was admissible based solely on an unauthenticated police report which was not offered into evidence.

As noted in *Taylor* and by the trial court, it is the trial court's responsibility to determine relevance of other crimes evidence. "A district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *Id*. at 296. Additionally, Defendant contends the evidence was not relevant to show intent because "[i]t is self-evident that the person who threw bottles into the house and set fire to the house intended to do so. Therefore, intent was never an issue in this case." We disagree with the contention that intent was not a proper reason to introduce the other crimes evidence. In *Taylor*, the defendant argued intent was not a genuinely contested matter but the court upheld the admissibility anyway, noting the State still had to prove intent as an essential element of the offense, which was a charge of possession with intent to distribute CDS II (cocaine). Likewise, there was no way for the trial court to know with absolute certainty at a pre-trial hearing that Defendant was not going to change his strategy and decide to argue the fire was set accidentally.

Finally, this court must still determine whether the other crimes evidence should not have been excluded under La.Code Evid. art. 403, which states that "[a]lthough relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Indeed, both appellate and trial counsel for Defendant have contended the evidence was unfairly prejudicial given the State's case for identifying Defendant as the firestarter was completely circumstantial. We find the 2006 arrest was mentioned only in passing during the testimony of the two fire investigators. While the 2018 arrest was discussed in more detail, the investigator glossed over the second degree battery that occurred the day before, noting only that Ms. Duncantel told him they "had got into an argument earlier the day before[.]" Given that the investigator also acknowledged that there were no witnesses who actually saw Defendant start the 2018 fire, we find the evidence of the arrest was not so prejudicial that its introduction was an abuse of the trial court's discretion. Accordingly, this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER TWO**

In Defendant's second pro se assignment of error, he contends his trial counsel was ineffective for not objecting to the State's introduction of text messages the victim testified were sent to her from Defendant. Specifically, Defendant contends his attorney was ineffective for not objecting to messages which were allegedly received after the fire but in the presence of a law enforcement officer.

> In *State v. Griffin,* 02–1703, pp. 8–10 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, 40, our brethren of the Fourth Circuit, with whom we agree, reviewed the law applicable to claims of ineffective assistance of counsel stating as follows:
>
> > Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be

17

conducted. *State v. Prudholm,* 446 So.2d 729 (La.1984); *State v. Johnson,* 557 So.2d 1030 (La.App. 4 Cir.1990); *State v. Reed,* 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. *State v. Seiss,* 428 So.2d 444 (La.1983); *State v. Ratcliff,* 416 So.2d 528 (La.1982); *State v. Garland,* 482 So.2d 133 (La.App. 4 Cir.1986); *State v. Landry,* 499 So.2d 1320 (La.App. 4 Cir.1986).

The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Fuller,* 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that he was prejudiced by the deficiency. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Strickland, supra,* 466 U.S. at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. *State v. Sparrow,* 612 So.2d 191, 199 (La.App. 4 Cir.1992).

This Court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." *State v. Bienemy,* 483 So.2d 1105 (La.App. 4 Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks,* 505 So.2d 714, 724 (La.1987).

*State v. Schexnaider*, 03-144, pp. 17-18 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 462.

While acknowledging that ineffective assistance of counsel claims should normally be relegated to post-conviction relief, the record here is sufficient to deal with this claim of ineffective assistance. Defendant's claim is that counsel's performance was deficient because counsel failed to object to the introduction of messages he contends were either not from him or that were received at a different time than presented by Ms. Duncantel. However, trial counsel did in fact object to the introduction of these messages based on them being hearsay, a lack of a foundation, failure to prove the messages were from Defendant, and failure to establish a time or date the messages were received. Trial counsel cannot be ineffective for doing exactly what Defendant contends he should have done. As such, Defendant cannot prove counsel was rendering deficient performance, and his ineffective assistance of counsel claim lacks merit.

### PRO SE ASSIGNMENT OF ERROR NUMBER THREE

In his final pro se assignment of error, Defendant contends trial counsel was again ineffective for failing to object and request a mistrial based upon Ms. Duncantel's commentary that she thought Defendant had "shot up" the house of one of his other children's mother. He contends that he was entitled to a mistrial under La.Code Crim.P. art. 770(2), which entitles a defendant to a mistrial when a comment "made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to" other crimes evidence that is otherwise inadmissible. We find the comment he is objecting to was made by a witness, not by any court official.

19

Defendant, relying upon *State v. Lee*, 569 So.2d 1038 (La.App. 3 Cir. 1990), contends that Ms. Duncantel's statement can be attributable to the State and therefore entitled him to a mistrial. As such, he contends counsel was ineffective for not moving for a mistrial. The situation in *Lee* is distinguishable and inapplicable to the instant situation. In *Lee*, the defendant was facing a charge of second-degree murder after shooting a thirteen-year-old boy during a camping trip. Despite no evidence of any sexual interaction between the defendant and the victim, the prosecution and two law enforcement witnesses repeatedly brought up the fact that defendant had previously engaged in homosexual activity, which at the time was criminalized as a crime against nature. This court attributed the comments to the State, noting "[w]hile arguing the objection by defendant out of the presence of the jury, the prosecutor admitted that he deliberately intended to elicit the testimony concerning defendant's homosexuality *in order to demonstrate defendant's state of mind* at the time of the incident." *Id*. at 1043. In the instant case, the State asked Ms. Duncantel to explain her text comment, introduced by defense counsel, regarding "if [Defendant's] dumb ass wouldn't have did what [he] did." Defense counsel objected to her answer, and the State moved on with its examination. There is no evidence that the State intentionally tried to introduce evidence of other crimes during this single instance.

As this claim of ineffective assistance of counsel requires a far more in-depth evaluation than Defendant's first claim, this claim is more properly addressed in post-conviction relief proceedings.

## CONCLUSION

Defendant's conviction is affirmed and his second claim of ineffective assistance of counsel relegated to post-conviction relief. Defendant's sentence is

20

amended to reflect the correct number of years required by La.R.S. 14:51 to be served without benefit of parole, probation, or suspension of sentence—two years. Additionally, this court instructs the trial court to make an entry in the court minutes and on the commitment order reflecting this change.

**CONVICTION AFFIRMED; SENTENCE AMENDED; REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.