612 So.2d 191 (1992)
STATE of Louisiana
v.
Corey M. SPARROW.
No. 90-KA-1498.
Court of Appeal of Louisiana, Fourth Circuit.
December 29, 1992.
*192 Donald Ray Pryor, New Orleans, for defendant.
Harry F. Connick, Dist. Atty., Valerie Welz, Asst. Dist. Atty., New Orleans, for plaintiff.
Before LOBRANO, ARMSTRONG and PLOTKIN, JJ.
ARMSTRONG, Judge.
The defendant, Corey Sparrow, was charged with two counts of attempted first degree murder, in violation of R.S. 14:27 and 14:30. After a jury trial, the defendant was found guilty of two counts of attempted *193 manslaughter. He was sentenced to serve ten years at hard labor on count one and six years at hard labor on count two. The sentences were to run consecutively with each other. It is from these convictions and sentences that defendant has appealed.
The record reflects that on October 1, 1989, Officer Michael Saiver of the New Orleans Police Department was dispatched to a shooting in the Willowbrook Apartments in New Orleans East. When he arrived on the scene, he found the victims, Diara Keeling and Demond Crump, lying on the ground. Diara Keeling had been shot in the abdomen, and Demond Crump had been shot in the left thigh. The victims informed the police officer that they had been shot by the defendant, Corey Sparrow.
Diara Keeling testified at trial that he and several friends were sitting on the front porch of the apartment complex when they were informed by a young girl, Mia Doors, that some guys were coming into the complex. Soon after, he saw three guys walking into the complex. While he and his friends were looking to see who was coming into the complex, they heard gunshots behind them. Keeling stated that he and his friends scattered and dropped down to avoid getting hit. Keeling's brother, Wangambe, tried to get several children who were playing in the area under cover. Keeling testified that the gunshots appeared to have been coming from behind a fence which separated the apartment complex from the Wal-Mart Store.
Keeling further stated that he saw someone running behind the fence. He, his brother and Demond Crump followed to find out who was shooting the gun. They went around the fence towards Wal-Mart. As they approached the dumpster near Wal-Mart, the defendant and Jimmy Brady, came around the other side of the dumpster. The defendant was holding a sawed off rifle. Jimmy Brady was handing the bullets for the rifle to the defendant. Wangambe Keeling began asking the defendant why was he shooting at them. The defendant did not respond. He then shot Demond Crump in the right thigh. Wangambe Keeling went to assist Crump. As Wangambe went to assist Crump, Diara Keeling tried to pull his brother back so that he would not get shot. The defendant then shot Diara Keeling in the abdomen. After shooting the two victims, the defendant and Brady ran away. By that time, one of Keeling's friends arrived, and helped Wangambe Keeling take Crump and Diara Keeling back to the apartment complex. Keeling testified that none of them had a weapon on them at the time of the incident.
Diara Keeling stated that his brother, Wangambe, and Jimmy Brady had been involved in a fist fight the day before the incident. One of his friends, Ron Wells, was also involved in the fight. He was fighting with someone named Ishmael. The fight had lasted about forty-five minutes.
At trial Demond Crump also testified that the defendant shot him in the leg without provocation. Crump's testimony corroborated Diara Keeling's testimony about the shooting incident. Both Crump and Keeling identified the defendant at trial and in a photographic lineup prior to trial. Crump stated at trial that the defendant was smiling when he shot him. Both Crump and Keeling testified that the defendant shot at them about seven to ten times. Crump further testified that he was not involved in the fist fight the day before. In fact, Crump stated that he was not even present at the scene of the fight. Two of Keeling's friends, who had been at the complex at the time of incident, testified at trial. Both Reginald Simmons and Derrick Patton corroborated Keeling's testimony about the gunshots in the complex. Patton also testified that he looked over the fence to see who was shooting the gun and recognized the defendant. The defendant was running with a sawed off .22 caliber rifle in his hand. Patton was also present the day before when Jimmy and Wangambe had a fist fight.
At trial Raynette Keeling, Diara Keeling's mother, testified that she was in her apartment when she heard gunshots in the complex. She looked outside from her window, *194 and saw the defendant and another boy standing behind the fence, shooting the gun into the complex. Ms. Keeling then called the police. She stated at trial that she did not see her son get shot.
Ms. Keeling testified that she saw the fist fight the day before between her son Wangambe and Jimmy Brady. She stated that she was on her way home from shopping when she saw Wangambe involved in a fist fight. According to Ms. Keeling's testimony, when she saw the fight, she stopped her vehicle, got out of the car, and proceeded to the area where the fighting was taking place. Ms. Keeling then intervened and stopped the fight. Her other son, Diara, was not involved in the fight. Demond Crump was not at the scene of the fist fight. Ms. Keeling also testified that she heard one of the guys in the other group say that they would be back.
As a result of the shootings, Diara Keeling spent sixteen days in the hospital and underwent two surgeries. Demond Crump was hospitalized for three days. The bullet still remains in his leg.
At trial Terri Ross, the EMS paramedic who treated and transported Diara Keeling to the hospital, testified that Keeling was in critical but stable condition when she arrived on the scene. His vital signs were holding well. Ms. Ross further stated that Keeling could have bled to death. Further, the entrance wound was close to the navel, and the bullet could have done substantial damage to several vital organs. The wounds received by both victims could have been life threatening.
At trial, the defendant testified on his own behalf. The defendant admitted to shooting the victims. However, defendant testified that he was shooting in self defense. The defendant stated that on the morning of the shooting, he and a few of his friends went to Thaddeus Boles' house. Around eleven o'clock a.m., he and his friends came out of Thaddeus' house. They saw the victims and their friends pass by on bicycles. The defendant and his friends then returned inside.
Around four o'clock p.m., the defendant and his friends again went outside. Three of the defendant's friends, namely, Thaddeus, Zaram, and Jonathan, walked to the Willowbrook apartment complex. The rest of the group, including the defendant, went for a walk. The defendant and his friends passed by Demond Crump, Diara Keeling, and Wangambe Keeling. According to the defendant, Demond had a pistol, Diara had a towel, and Wangambe had a knife. Demond, Diara and Wangambe started to run towards them. One of defendant's friends, Charles Barnes, proceeded to run away. The defendant also started to run. He then stopped and pulled out a gun. The defendant stated that he fired the gun three times, saw Diara and Demond fall, and then ran. He also stated that the victims had friends in a black car which were also shooting at them. The defendant testified that he used his gun because he felt his life was threatened.
The defendant stated that on the day prior to the shooting, he and several friends went to the store for Jimmy Brady's mother. When they came out of the store, they saw the Keeling brothers and some of their friends playing basketball. He stated that Wangambe Keeling started fighting with Jimmy. Diara Keeling then jumped into the fight. Charles Barnes then jumped in to help Jimmy.
At trial the defendant's friends, Jamal Kisak, Charles Barnes, and Thaddeus Boles, testified on the defendant's behalf. Charles Barnes testified that the day before the shooting, he and Jimmy Brady were beaten up by Diara and Wangambe Keeling and their friends. Barnes stated that while the fight was in progress, Raynette Keeling drove up with some guy in the car. The guy allegedly got out of the car and started fighting with them. According to Barnes, there were about six guys beating up on himself and Jimmy. Barnes further stated that after he and Jimmy had been pushed to the ground, Keeling's mother stopped the fight. Barnes did not receive any injuries from the fight. Brady sustained only a busted lip from falling on the ground. Barnes also testified that on the day of the incident, he and the defendant were on their *195 way to Wal-Mart when they passed Demond and Diara. According to Barnes, Demond and Diara started shooting at them. A black vehicle appeared and its occupants also started to shoot at them. Barnes separated from the defendant and ran away.
Thaddeus Boles testified that Charles Barnes was not involved in the fight which occurred the day prior to the shooting. According to Boles, Ishmael and Jimmy were fighting with Diara and Wangambe Keeling and Ron Wells. Boles admitted that he had been drinking that day. Boles further testified that the whole neighborhood was watching the fight. On the morning of the shooting, Boles stated that he saw the Keeling brothers and their friends riding bicycles. Later that day, Boles and two of his friends, Zaram and Jonathan, were walking into the Willowbrook apartment complex when the Keeling brothers and their friends started to come after them. Boles had just left the defendant, Jimmy and Charles on Bundy Road. Boles admitted that he heard gunshots in the complex. He stated that he did not know where the shots were coming from or who was shooting the gun.
Jamal Kisak was not present at the shooting on October 1, 1989. Kisak testified that he was present at the fight which occurred the day before the incident. According to Kisak, only Diara, Wangambe and Jimmy were involved in the fight.
Raynette Keeling testified on rebuttal that, on the day of the shooting, she did not see any black automobile when she looked outside her window immediately after hearing the gunshots. Ms. Keeling also stated that there was no man in her car on the day of the fight. Ms. Keeling's daughter, Ashley Watts Horton, also testified on rebuttal that she, her mother, her aunts and two of her cousins were coming from a shopping trip when they noticed the fight. Ms. Horton stated that only Wangambe was involved in the fight. He was fighting Jimmy Brady. Ms. Horton also testified that she did not recall seeing the defendant at the scene of the fight. She stated that she saw Ishmael throw a mailbox and heard Jamal Kisak say that they would be back.
Our review of the record has revealed no errors patent.
Assignment of Error No. 1
By this first assignment of error, the defendant contends that he is entitled to a new trial on the basis that newly discovered evidence reveals that the victims were members of a gang, namely the Bally Boys, and were the aggressors in the shooting incident. The defendant contends that he has found two witnesses whose testimony would support this contention.
Code of Criminal Procedure article 851 provides, in pertinent part, that the trial court shall grant a new trial, upon motion of the defendant, whenever
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at trial it would have probably have changed the verdict or judgment of guilty.
A motion for a new trial shall be in writing, state the grounds on which it is based, and be tried contradictorily with the district attorney. C.Cr.P. article 852. Generally, a motion for new trial must be filed and disposed of prior to sentencing. C.Cr.P. article 853. However, when a motion for a new trial is based upon newly discovered evidence,
the motion may be filed within one year after the verdict of judgment of the trial court, although a sentence has been imposed or a motion for a new trial has been previously filed; but if an appeal is pending the court may hear the motion only on remand of the case.
La.C.Cr.P. art. 853.
A motion for a new trial based on newly discovered evidence must contain allegations of fact, sworn to by the defendant or his counsel, showing:
(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discoverable before or during the trial;

*196 (2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
(3) The facts which the witnesses or evidence will establish; and
(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
La.C.Cr.P. art. 854.
In the present case, the defendant did not file a motion for a new trial. The record has been completely reviewed and no such motion has been found. Further, the defendant has not alleged that he filed a motion for new trial which was denied by the trial court. On appeal, he simply argues that he now has newly discovered evidence which would establish that the victims, Demond Crump and Diara Keeling, were members of a gang, and were the aggressors in the shooting. The defendant, however, fails to provide this Court with the names of the witnesses. In fact, the defendant has not provided this Court with any of the information required in C.Cr.P. article 854.
Furthermore, any such testimony would simply be cumulative. Defendant and his witnesses testified at trial that Demond Crump and Diara Keeling were members of the Bally Boys. The defendant and Charles Barnes both testified that they were on their way to Wal-Mart when the victims and several of their friends starting shooting at them. All of the defense witnesses also testified that Diara and Wangambe Keeling initiated the fight the day before the shooting. Thus, this assignment is clearly without merit.
Assignment of Error No. 2
By this assignment of error, the defendant argues that his right to a fair trial was violated when, on the morning of trial, he was informed that his co-defendant, Jimmy Brady, was exercising his right against self-incrimination and would not testify on the defendant's behalf. Defendant contends that the trial court should have granted him a continuance.
Jimmy Brady was charged in the same bill of information as the defendant, with two counts of attempted first degree murder. On January 3, 1990, Brady's attorney filed a motion for severance. The trial court, on January 17, 1990, denied the motion. Counsel for Brady made an oral motion for severance on January 26, 1990, which was granted. On the day of trial, January 29, 1990, the trial court noted that upon motion of defense, the matter was severed as to Brady. After the trial court granted the severance, it set Brady's trial for February 5, 1990. On March 14, 1990, Brady entered a plea of guilty to two counts of accessory after the fact to attempted manslaughter.
There is nothing in the trial transcript to indicate that counsel for the defendant attempted to call Brady as a witness. Nowhere in the transcript is there any indication that Brady took the witness stand and stated for the record that he was exercising his right against self-incrimination. Further, the record is devoid of any indication that the defendant objected to the severance. The defendant did not seek a continuance when informed that Brady's motion to sever had been granted. Nor did the defendant seek a continuance when Brady allegedly stated that he intended to exercise his right against self-incrimination.
As the defendant failed to object to the severance and did not seek a continuance when informed of the severance and of Brady's intention to exercise his right against self-incrimination, his right for review of this matter has not been preserved for appeal. Code of Criminal Procedure article 841 provides, in pertinent part, that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence...."
This assignment of error is without merit.
Assignment of Error No. 3
By this assignment of error, the defendant claims that his sentence is unconstitutionally excessive. The defendant has failed to brief this assignment. Accordingly, this assignment of error is deemed as abandoned. State v. Bray, 548 So.2d 350 *197 (La.App. 4th Cir.1989); Rule 2-12.4, Uniform Rules, Courts of Appeal.
Assignment of Error No. 4
By this assignment of error, the defendant argues that the jury erred in believing that the victims were not the aggressors. The defendant suggests that since the jury found that "sudden passion or heat of blood" existed and convicted him of attempted manslaughter, the jury should have also found that the victims were the aggressors in the shooting. The defendant seems to have confused the elements of self defense with the mitigating factors which must be present to reduce a charge of attempted first degree murder or second degree murder to attempted manslaughter. It is well within the jury's discretion to have found that the defendant acted in sudden passion but not in self defense.
L.S.A.-R.S. 14:31 defines manslaughter, in pertinent part, as "a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection." "Heat of blood" or "sudden passion" are mitigating factors which lessen the degree of culpability of the homicide. The defendant has the burden of establishing the existence of these factors by a preponderance of the evidence for a verdict of manslaughter to be appropriate. State v. Lombard, 486 So.2d 106 (La.1986); State v. Heck, 560 So.2d 611 (La.App. 4th Cir.1990), writ denied, 566 So.2d 395 (La.1990).
L.S.A.-R.S. 14:19 states that:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
In a non-homicide case, the defense of self defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances and (2) a subjective inquiry into whether the force was apparently necessary. State v. Freeman, 427 So.2d 1161 (La.1983); State v. Landry, 381 So.2d 462 (La.1980); State v. Ford, 368 So.2d 1074 (La.1979). There is some question as to whether the State or the defendant bears the burden of proof in this matter.
The Louisiana Supreme Court stated in State v. Freeman, supra that
[t]he burden of persuasion in proving self-defense in a non-homicide situation pursuant to La.R.S. 14:19, which entails a subjective as well as an objective inquiry, could arguably, in fairness to the State, be upon the defendant, since a subjective inquiry is involved.
Freeman, supra at 1163.
The Court in Freeman did not resolve the issue regarding the allocation of the burden of proving self-defense in a non-homicide situation, holding that, even assuming the State had the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, the State carried its burden of proof. Id. at 1161.
Likewise, we find that, even assuming for the sake of argument that the State bore the burden of proving that defendant did not act in self-defense in shooting the two victims, for the following reasons, we conclude that the State carried its burden of proof.
In the instant case, the State and defense witnesses produced two conflicting stories as to the shooting incident. Diara Keeling and Demond Crump, the victims, claimed they were ambushed and unarmed when the defendant shot them. The defendant admitted shooting the victims but only because his felt his life was threatened. He claims the victims were shooting at him.
The jurisprudence is clear that "[w]hen there is conflicting testimony as to a factual matter, the question of credibility of witnesses is within the discretion of the *198 trier of fact." State v. Dill, 461 So.2d 1130, 1135 (La.App. 5th Cir.1984), writ denied, 475 So.2d 1106 (La.1985); State v. Klar, 400 So.2d 610 (La.1981).
On appeal, the function of a reviewing court is not to reassess the credibility determinations of the factfinder but only to determine if the evidence offered was sufficient to support the conviction as required by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See State v. Richardson, 425 So.2d 1228 (La. 1983); State v. Lee, 445 So.2d 54 (La.App. 4th Cir.1984). Such factual determinations will not be disturbed on appeal unless clearly contrary to the evidence. State v. Klar, supra; State v. Coleman, 432 So.2d 323 (La.App. 1st Cir.1983).
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, supra; State v. Jacobs, 504 So.2d 817 (La. 1987).
The victims, Diara Keeling and Demond Crump, testified at trial that the defendant and Jimmy Brady ambushed them. Keeling and Crump both testified that they were unarmed. They further stated that the defendant, who was standing about twenty to thirty yards from them, aimed the weapon directly at them prior to shooting. Crump even testified that the defendant was smiling while he had the gun aimed at the victims.
The defendant and Charles Barnes testified that Diara Keeling, Wangambe Keeling and Demond Crump started to charge the defendant and Barnes when he and Barnes passed them on the way to Wal-Mart. The defendant testified that Demond Crump had a pistol in his hand. Wangambe Keeling allegedly had a knife and Diara Keeling had a towel wrapped around his hand. The defendant and Barnes also stated that after the Keeling brothers and Crump started to run after them, a black car appeared and it occupants started to shoot at the defendant and Barnes. At that point, Barnes ran away. The defendant, however, stated that he stopped running, turned around, pulled out the sawed off rifle and shot at the victims. The defendant stated that he shot the gun three times and then ran off.
Witnesses for both the defense and the prosecution acknowledge that a fight occurred the day before the shooting incident which involved friends of the defendant and the victims. However, the testimony differs as to who was actually involved in the fight. Diara Keeling and Derrick Patton, the State's witnesses, testified that Wangambe Keeling and Ron Wells were involved in fist fight with Jimmy Brady and one of his friends, Ishmael. Demond Crump did not see the fistfight.
Raynette Keeling, Diara and Wangambe's mother, testified at trial that, on the day of the fight, when she pulled up to the area where the fight was occurring, only Wangambe was fighting. Diara was not involved in the fight at that time, and Demond Crump was not on the scene. Ms. Keeling also stated that she did not see the defendant at the scene of the fight. Further, Ms. Keeling stated that one of the guys in the other group made a comment that they would be back. Ms. Keeling's testimony was corroborated by her daughter's testimony. Ashley Watts Horton, Ms. Keeling's daughter, stated that when she and her mother approached the scene of the fight, Wangambe was fighting Jimmy Brady. Ashley further stated that she did not recall seeing the defendant that day. She recalled hearing Jamal Kisak state that they would be back.
Defense witness Charles Barnes stated that he and Jimmy Brady were beaten up by Diara Keeling, Wangambe Keeling and four other guys. Thaddeus Boles testified that he saw the fight the day before the shooting incident, and that Jimmy and Ishmael were fighting with Diara and Wangambe Keeling and Ron Wells. According to Boles, Charles Barnes was not involved in the fight. Jamal Kisak also stated that he had seen the fight the day before the shooting. Kisak stated that Jimmy Brady *199 and Charles Barnes were fighting with Diara and Wangambe Keeling. Kisak testified that Ishmael did not participate in the fight.
The defendant testified at trial that initially only Jimmy and Wangambe Keeling were fighting. Subsequently, Diara Keeling, Derrick Patton, and a few of their friends joined the fracas. Charles Barnes then jumped in to assist Jimmy Brady.
Given the conflicting testimony concerning the shooting and the fight the day preceding the shooting, the jury was well within its discretion in choosing which witnesses to believe. Reviewing the evidence in the light most favorable to prosecution, it is clear that the evidence presented at trial was sufficient for the jury to find that defendant's shooting of the two victims was not reasonable under the circumstances nor was it apparently necessary.
Pro Se Assignment of Error No. 1
The defendant filed a pro se brief in which he assigns only one error: ineffective assistance of counsel. The defendant argues that his counsel was ineffective in failing to object to erroneous jury charges, and in the investigation and preparation of an adequate defense.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 557 So.2d 1030 (La.App. 4th Cir.1990); State v. Reed, 483 So.2d 1278 (La.App. 4th Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4th Cir.1986); State v. Landry, 499 So.2d 1320 (La.App. 4th Cir.1986).
In the present case, the defendant alleges that his attorney failed to adequately investigate and prepare a defense and to object to erroneous jury charges. The record before this Court is insufficient to determine the merits of the defendant's allegations that his attorney failed to adequately investigate and prepare a defense. These claims would be more properly raised in an application for post conviction relief, where a full evidentiary hearing can be conducted.
However, this Court has been provided with a transcript of the jury instructions. Thus, a review of the defendant's claim that his attorney failed to object to erroneous jury charges is possible.
The relator's claim of ineffective assistance of counsel is to be assessed by the two part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La. 1984). The relator must show that counsel's performance was deficient and that the deficiency prejudiced the relator. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Strickland, supra at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the relator if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the relator "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra at 693, 104 S.Ct. at 2068. The relator must make both showings to prove that counsel was so ineffective as to require reversal.
The defendant contends that his trial counsel failed to object when the trial court gave the jury erroneous instructions on the definitions of attempted first degree murder, attempted second degree murder, and attempted manslaughter. The defendant alleges that the trial court instructed the jury that to convict the defendant of an attempt crime, it needed to find that the defendant had the specific intent to kill or to inflict great bodily harm. The defendant *200 argues that the inclusion of the phrase "to inflict great bodily harm" was erroneous. The defendant is correct that a conviction for attempted murder or attempted manslaughter requires a specific intent to kill. State v. Strother, 362 So.2d 508 (La.1978); State v. Butler, 322 So.2d 189 (La.1975); State v. Odom, 511 So.2d 1214 (La.App. 2nd Cir.1987), writ denied, 515 So.2d 446 (La.1987); State v. Banks, 496 So.2d 1099 (La.App. 4th Cir.1986).
A review of the jury instructions reveals that the defendant's allegations are without merit. The trial court did not include the "infliction of great bodily harm" in its definitions of attempted first degree murder, attempted second degree murder, or attempted manslaughter.
Aggravated battery does not involve any specific intent to kill. The next three possible verdicts of guilty all do, however. Each of the other three that involve a verdict of guilty, guilty of attempted manslaughter, attempted second degree murder and attempted first degree murder all require and involve the presence of specific intent to kill.
Ladies and gentlemen of the Jury, if you find in this case that the defendant attempted to kill any victim as alleged, and if you find in this case that there was provocation that caused the person, the defendant, to act in that fashion and that provocation was sufficient to deprive an average person of his self control and cool reflection, then you would be justified in finding the defendant guilty of attempted manslaughter.
An attempted manslaughter involves a situation where the offense would be attempted murder, either in the first or second degree. But the attempt to kill is reduced in manslaughter because there is provocation sufficient to cause the average person to loose (sic) his self control and his cool reflection. If you were to find that a person having been so provoked had an opportunity to cool his blood or that the average person's blood would have cooled under like circumstances, then the attempt to kill would be murder in the first or second degree.
What is attempted murder in the second degree. It is the attempt to kill another human being. It is a situation, as each of these are that involves an attempt, manslaughter, second degree or first degree murder, it is a situation where a person specifically intends that another die and actively desire another person die. They do something in furtherance of that desired hope, hoping to see the person die. The mere fact that they might have prepared to commit a crime is never enough for an attempt. However, the mere fact that they would not have succeeded, that it would have been impossible to carry out their goal of having the person die does not mean they cannot be found guilty of an attempt to commit murder or manslaughter.
Ladies and gentlemen of the Jury, an attempted murder in the second degree is an attempt to kill another human being without any provocation. What is it that distinguishes an attempted murder in the first degree from attempted murder in the second degree is that an attempted murder in the first degree involves a situation where you actively desire to really want more than one person to die. Thus, if there is a situation where a person intended that two or more persons die and that person did something in furtherance of that desire goal of seeing more that one person died (sic), they would be guilty of an attempted murder in the first degree.
As the trial court did not give erroneous jury charges, there was no basis for the defendant's attorney to object to the charges given. Thus, the failure of defendant's counsel to object to the jury instructions on attempted first degree murder, attempted second degree murder and attempted manslaughter does not constitute ineffective assistance of counsel.
This assignment of error is without merit.
For the foregoing reasons the defendant's convictions and sentences be affirmed.
AFFIRMED.