| STATE OF LOUISIANA | * | NO. 2021-KA-0494 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| ANTOINE EDWARDS | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 535-495, SECTION "B"
Honorable Tracey Flemings-Davillier, Judge
\* \* \* \* \* \*
**Judge Daniel L. Dysart**
\* \* \* \* \* \*
(Court composed of Judge Daniel L. Dysart, Judge Joy Cossich Lobrano, Judge
Paula A. Brown)

*LOBRANO, J., CONCURS IN THE RESULT.*
*BROWN, J., CONCURS IN THE RESULT*

Jason Rogers Williams
DISTRICT ATTORNEY
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

G. Benjamin Cohen
Chief of Appeals, DISTRICT ATTORNEY
619 S. White Street
New Orleans, LA 70119

Brad Scott
Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY
619 S. White Street
New Orleans, LA 70119


      COUNSEL FOR STATE OF LOUISIANA/APPELLEE



Christopher A. Aberle

LOUISIANA APPELLATE PROJECT
P.O. Box 8583
Mandeville, LA 70470-8583


COUNSEL FOR DEFENDANT/APPELLANT

AFFIRMED
**FEBRUARY 16, 2022**

*DLD*

In this criminal appeal, the defendant, Antoine Edwards, appeals his conviction for two counts of second degree murder. For the following reasons, we affirm.

**PROCEDURAL BACKGROUND**

On June 22, 2017, defendant, Antoine Edwards, was charged by bill of information with the second degree murder of Joshua Johnson, the second degree murder of Ryan Johnson, and with obstruction of justice in a second degree murder investigation. On June 29, 2017, defendant appeared for arraignment and entered pleas of not guilty.

Following a three-day trial on the murder counts, a unanimous jury, on September 12, 2019, found defendant guilty on both counts. On September 30, 2019, the State dismissed the obstruction of justice count. On that same date, the trial court denied the defendant's post-trial motions, including his motion for a new trial, and defendant waived the twenty-four- hour statutory sentencing delay. Accordingly, the court proceeded to sentence the defendant to two concurrent life

sentences without benefit of probation, parole or suspension of sentence. Defendant made no oral motion for appeal following sentencing.

On September 4, 2020, the defendant filed a pro se post-conviction application seeking an out-of-time appeal. The pro se post-conviction application was received by the trial court on November 24, 2020. On March 31, 2021, the trial court granted defendant an out-of-time appeal.

**FACTUAL BACKGROUND**

Sergeant Merrell Merricks ("Sgt. Merricks") testified that he had been employed by the New Orleans Police Department for twenty-three years and was charged with the responsibility of storing and authenticating 911 telephone calls. The 911 calls associated with the murders at issue were played for the jury and reflected numerous callers informing that they heard five or six gunshots and that two people had been shot but no one witnessed the actual shooting.

Anita Johnson, the mother of the murder victims, testified that she had been using crack cocaine for approximately ten years and had felony convictions in connection with her drug use. She admitted that she was "on crack" in July, 2016, when the murders took place. She stated that she would go to "Carl's house" to "get high" and that defendant sold drugs from Carl's house.

On the date of the murder, Anita Johnson spoke on the telephone with her son, Joshua, who informed her that he and her other son, Ryan, were on their way to Carl's house to purchase marijuana. On that same date, Anita Johnson received a telephone call from Carl who informed her that he had heard gunshots and had heard Ryan arguing with someone outside and that she needed to get to the house.

2

According to Anita Johnson, she arrived at the house in approximately five minutes and went straight to the car parked in front of the residence as she could see her sons were in the car. When she arrived, Ryan was dead and Joshua died shortly thereafter. She stated that it was her belief that defendant killed her sons because they were arguing with defendant shortly before the shooting. On cross-examination, she explained that she did not witness the argument but knew about it because both Joshua and Carl told her that Ryan had been arguing with defendant.

New Orleans Police Officer Michael Lane ("Ofc. Lane") testified that he responded to an incident that occurred in the 2800 block of Pauger Street in the early morning of July 31, 2016. When he arrived, he found two dead bodies in a vehicle, the victims of gunshot wounds. Ofc. Lane stated that the mother of the victims was very upset and had to be physically removed from the vehicle. The mother was screaming defendant's name, "Toine."

New Orleans Police Detective Theophilus Kent ("Det. Kent") testified that he was assigned to the homicide division and investigated the murders at issue. When he arrived, the bodies were still on the scene, in the vehicle, and there were cartridge casings on the sidewalk next to the vehicle. There were also several bystanders in the area, outside the crime scene, but defendant was not one of them.

The following day, Det. Kent canvassed the area for witnesses but no one provided him with any information at that time. Later, Det. Kent received the name of a witness, Torrie Williams ("Ms. Williams"), who wanted to speak with him. Det. Kent testified that Ms. Williams did not ask for anything in exchange for her statement. According to Det. Kent, Ms. Williams identified a person who had bragged about shooting the victims. Thereafter, Det. Kent presented Ms. Williams with a six-person photographic lineup and Ms. Williams identified defendant as the

3

person who had bragged about shooting the victims. Accompanying Ms. Williams to the photographic lineup was Hermade Bradley ("Mr. Bradley"). Det. Kent stated that Mr. Bradley corroborated Ms. Williams' statement that defendant had bragged about shooting the victims.

As part of his investigation, Det. Kent separately interviewed two other witnesses, Mashonda Johnson and Maguina Journee ("Ms. Journee"). Det. Kent testified that Mashonda Johnson identified defendant as being on the scene at the time of the murders and that defendant later bragged about committing the murders. Similarly, Det. Kent stated that Ms. Journee told him that she saw defendant at the scene of the crime and that he later bragged about the shootings.

Det. Kent interviewed a fourth witness, Tonya Dillion ("Ms. Dillion"), who had been arrested and had informed Det. Kent that she wanted to provide information regarding the homicides that Det. Kent was investigating. Det. Kent testified that Ms. Dillion provided a recorded statement and identified someone who Det. Kent, based upon the interviews he had previously conducted, already suspected as having committed the murders.

Based upon the above-described interviews, along with an interview with the victims' mother, Det. Kent procured an arrest warrant for defendant. Thereafter, Det. Kent spoke with defendant over the telephone, informing that he had a warrant for his arrest. At that point, defendant did not provide Det. Kent with a statement but he agreed to surrender to police. However, rather than turning himself in, defendant fled to Atlanta, where he was captured by authorities.

Eventually, the weapon used to murder the victims was recovered by the New Orleans Police Department's gang unit. Dante Edwards, defendant's cousin, was on the scene when the weapon was recovered. Further, Det. Kent discovered

4

that defendant's address, prior to the homicides, was 2901 Pauger Street, which was less than 300 feet from where the shootings occurred.

On cross-examination, it was established that Carl's last name was "Baptiste." As part of his investigation, Det. Kent learned that defendant sold illegal drugs from Carl's house and, according to multiple individuals, defendant "would hang out all day" at Carl's house. Det. Kent admitted that the defendant was not at the murder scene when he arrived. Further, the firearm used in the murders was recovered from Robert Housey ("Mr. Housey"), rather than Dante Edwards, defendant's cousin. However, Dante Edwards was standing with Mr. Housey when the officers arrived on the scene. On re-direct examination, it was established that all the anonymous tips received, with the exception of one "regarding a man who didn't exist and a house that didn't exist," identified defendant as the assailant.

Mashonda Johnson, in connection with her direct examination, admitted that she had prior criminal convictions and was currently incarcerated in connection with a probation hold associated with a theft charge. She also admitted that she had a domestic violence conviction.

Mashonda Johnson explained that a couple of months after the victims were shot, around the same time she became a witness in this case, she also was shot. On this basis, Mashonda Johnson was reticent to provide testimony. She stated that she knew the victims for a "long, long time." She also knew defendant. She explained that in 2016, when the murders took place, she was selling marijuana. She received her marijuana from the defendant. She explained that at that time, defendant supplied the majority of the drug dealers in the area.

5

At the time of the murders, Mashonda Johnson was in a nearby apartment where her mother, Tonya Dillion, lived. She testified that she could hear defendant and the victims arguing over the fact that the victims had used the wrong door to gain entrance to Carl's house, where the purchase of marijuana was to take place. She explained that when an individual purchased marijuana from defendant, he or she was supposed to enter through the back door and the victims had knocked on the front door. Within minutes of hearing the argument, Mashonda Johnson heard several gunshots. When she went outside, she saw the victims in the car, but she did not see defendant on the scene.

Mashonda Johnson stated that she saw the defendant the following day and overheard him state that "[w]hen the police come, he was going out with a bang." The defendant also stated that "he was going to shoot the [victims'] funeral up."

Officer Sean McElrath ("Ofc. McElrath"), a member of the New Orleans Police Department for sixteen years, was accepted without objection as an expert in firearms examination. Ofc. McElrath testified that, in connection with the murders at issue, a total of nine shell casings were provided for his examination and of that number, he was able to ascertain that eight were fired from the same gun; the ninth was not amenable to testing because it was too damaged.

Kenneth Leary ("Mr. Leary") stated that he was employed "at the City of New Orleans Police Department's Crime Lab as a criminalist 3 working in the firearms examination unit." Mr. Leary was accepted without objection as an expert in firearms examination. Mr. Leary testified that in connection with the murders for which defendant was being tried, he was asked to "make a comparison between a firearm and a number of pieces of ballistic evidence" recovered from the murder scene. The tests performed on the firearm reflected that with the exception

6

of one casing that was too damaged to test, the cartridges were fired from the recovered weapon, a Glock pistol. Mr. Leary explained that he fired the Glock pistol, then compared the expelled cartridges with the cartridges recovered from the crime scene and they matched.

Torrie Williams ("Ms. Williams") testified on direct examination that she had a 2017 misdemeanor conviction for trespassing. She stated that she knew defendant and confirmed that he often went by the nickname "Toine." Ms. Williams stated that she also knew the victims, Joshua and Ryan Johnson. Ms. Williams explained that the father of her children, Hermade Bradley ("Mr. Bradley"), was friends with the defendant.

Following the murders, Ms. Williams stated that defendant came to her house, looking for Mr. Bradley. Ms. Williams stated that she did not let the defendant into the house because by that time, defendant had already been implicated in the murders. So, Mr. Bradley and the defendant spoke outside and Ms. Williams went outside also. She overheard the defendant tell Mr. Bradley about the murders, explaining that it concerned a ten-dollar bag of marijuana. When the defendant refused to sell them the marijuana, an argument ensued and the defendant proclaimed that if the police came after him, he was going to "shoot at them." Ms. Williams stated that the defendant was armed with a gun when he was talking to Mr. Bradley.

Ms. Williams testified that upon hearing the conversation between defendant and Mr. Bradley, she contacted police because defendant "said he killed them boys." Ms. Williams agreed to provide the police with a recorded statement and claimed that she did not ask for anything in exchange for that statement. Thereafter, Ms. Williams was presented with a six-person photographic lineup and

7

she identified the defendant. Ms. Williams stated that while the defendant was outside of her house, speaking with Mr. Bradley, his girlfriend arrived and stated that she was taking the defendant to Atlanta, Georgia.

On cross-examination, Ms. Williams admitted that in addition to criminal trespass, she also pled guilty to domestic abuse battery, for which she "received a probation plea." Further, Ms. Williams stated that following the murders, she went to the scene and all the neighbors were talking about how the defendant had shot the two victims. The defendant then came to speak with Mr. Bradley and Ms. Williams heard "from out of [defendant's] mouth [that] he did it." Thereafter, Ms. Williams contacted the police.

On re-direct examination, Ms. Williams was questioned about whether she was promised any leniency in connection with her prior convictions in exchange for her testimony. She answered in the negative.

Tonya Dillion ("Ms. Dillion") admitted, upon questioning by the State, that she had several prior convictions. She confirmed that she had been convicted of drug offenses, of burglary, of forgery and of theft. Ms. Dillion testified that in July of 2016, she was living at 2828 Pauger Street. She stated that she knew defendant as he was her drug dealer in 2016; she was "using cocaine," explaining that at that time she was using cocaine "every day, all day." She would buy the drugs from defendant next door at Carl's house. Ms. Dillion testified that she also knew the victims, Joshua and Ryan Johnson, explaining that they were friends with her daughter, Mashonda Johnson.

While Ms. Dillion did not witness the shooting, she heard the victims "fussing" with the defendant. Specifically, Ms. Dillion heard Ryan Johnson say, "I ain't scared of you," and thereafter, she heard gunshots and "hit the floor."

8

Following the shooting, she saw Carl outside, but the defendant had left. In fact, following the shooting, she no longer saw the defendant in the area as he stopped selling drugs out of Carl's house.

Ms. Dillion did not contact the police immediately following the murders. It was not until a month later, after she was arrested for a felony offense, that she informed police that she wanted to speak with a detective about the incident. She told police that she wanted her charge dropped in exchange for her statement regarding the murders, but the charge was not dropped. Instead, she pled guilty to the pending felony charge.

As the defendant was her drug dealer, and Ms. Dillion was a daily cocaine user, she saw defendant frequently. She testified that she had often seen defendant in possession of a weapon.

On cross-examination, Ms. Dillion admitted to being a multiple offender, having numerous other convictions. Ms. Dillion stated that in connection with the felony charge to which she pled guilty, she was sentenced to time served. Defense counsel insinuated that her sentence in this regard may have been connected to the information she provided to prosecutors in the matter at hand, but Ms. Dillion denied the insinuation, stating that the prosecutors involved in the instant case had nothing to do with her most recent felony conviction.

Dr. Samantha Huber ("Dr. Huber"), chief forensic pathologist at the Orleans Parish Coroner's Office, was accepted without objection as an expert in the field of forensic pathology. Dr. Huber testified that she performed an autopsy on Ryan Johnson which reflected that he suffered six gunshot wounds. Dr. Huber also performed an autopsy on Joshua Johnson who suffered three gunshot wounds. As

with Ryan Johnson, Dr. Huber classified Joshua's death as a homicide caused by multiple gunshot wounds.

New Orleans Police Detective Westley Humbles ("Det. Humbles") testified that he was "assigned to the street gang unit in the special operations division." On October 25, 2016, Det. Humbles came into contact with Dante Edwards who was with several individuals including Norbert Housey ("Mr. Housey"). When police approached the group, they could "smell an odor of marijuana coming from the area" and, at that point, the group attempted to disperse. Det. Humbles witnessed Mr. Housey "grab an object in his waistband, which [Det. Humbles] believed to be a handgun" and then Mr. Housey "took off running," at which point the handgun became visible. While running, Mr. Housey discarded the weapon which the police recovered. The weapon was later provided to the ballistics lab for testing.

**ERRORS PATENT**

There were no errors patent discovered.

**DISCUSSION**

**COUNSEL ASSIGNMENT OF ERROR NUMBER 1**

Defendant argues that regarding witnesses, Mashonda Johnson and Torrie Williams, "the prosecutor actively elicited false and misleading testimony designed to conceal vulnerabilities in their credibility and thereafter allowed that testimony to go uncorrected." Following the United States Supreme Court ruling in *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the defendant asserts that his convictions should be reversed and a new trial ordered.

> To prove a *Napue* claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony

10

> reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. *Id.* at 269, 79 S.Ct. 1173. Furthermore, fundamental fairness to an accused, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

*State v. Broadway*, 96-2659, p. 17 (La. 10/19/99), 753 So. 2d 801, 814, *cert. denied,* 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (emphasis added).

A review of the testimony reflects that while jurors were made aware that Mashonda Johnson and Torrie Williams had criminal histories, the jurors were not made fully aware of the extent of their backgrounds.

Torrie Williams, on direct examination, admitted to having a trespassing conviction and on cross-examination, she also admitted to having a conviction for domestic abuse battery.[1] The defendant asserts that in addition to the above-admitted convictions, Ms. Williams faced outstanding charges which included "two felonies—home invasion and domestic abuse aggravated assault with a dangerous weapon—and two misdemeanors—criminal trespass, and aggravated assault.[2]" After providing her statement in connection with the murders at issue, Williams pleaded guilty to misdemeanor trespass and aggravated assault and received concurrent thirty-day suspended sentences.[3] As with Mashonda Johnson, the defendant claims that Ms. Williams, in connection with her outstanding charges and subsequent guilty pleas, received relatively lenient sentences in exchange for

---

[1] *See supra* at pp. 11 and 12.
[2] OPCDC # 530-359 G.
[3] *Id.*

her testimony. Once again, however, defendant provides no evidence to support this claim.

The defendant does not contend, nor is there any evidence to support, that the State, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), withheld evidence of the witnesses' convictions. The witnesses' convictions were a matter of public record, as readily available to defense counsel, as it was to the prosecution.

While the jury may not have been aware of the extent of these witnesses' criminal histories, the jury was aware that they, in fact, had criminal convictions in their past. To establish a *Napue* violation, not only must a defendant show that a prosecutor acted in collusion with a witness to facilitate false testimony (a showing defendant has not made), it must also be shown that the witnesses' false testimony, in this case, the extent of their past criminal infractions, could have affected the jury's verdict. Such is not the case in the instant matter.

While no witness actually saw defendant shoot the victims, witnesses did hear defendant quarreling with one or both victims minutes before shots were fired. Not only did Mashonda Johnson, who was well-acquainted with both the victims and defendant, hear them quarreling before shots rang out, her mother, Tonya Dillion, who also knew defendant and the victims, heard the "fussing." There was no doubt in their minds that it was defendant and the victims in an argument, but later, when they went outside to see what had transpired, the defendant had fled the scene. Additionally, both Mashonda Johnson and Ms. Williams offered testimony to the effect that they saw defendant after the murders. Mashonda Johnson stated that the defendant had informed her that when the police came after him he was "going out with a bang," and Ms. Williams corroborated this testimony, testifying

12

that defendant said when the police came to get him, he was going "to shoot at them." The defendant's girlfriend, however, had other ideas, informing Ms. Williams that she was taking defendant to Atlanta which is ultimately where defendant was apprehended. Further, Ms. Williams heard defendant admit to the murders, explaining what had happened and how the argument commenced during the victims' attempt to purchase a bag of marijuana.

It is well-established that evidence of a State witness' potential bias or lack of credibility, arising from his or her prior criminal convictions, is a matter that a defendant is entitled to pursue. *State v. Quinn,* 2012-0689, pp. 13-14 (La. App. 4 Cir. 8/21/13), 123 So.3d 320, 328, *writ denied,* 2013-2193 (La. 3/14/14), 134 So.3d 1195. However, where such evidence is not offered at trial, as was the case in *Quinn*, said error does not necessitate a new trial. Specifically, in *Quinn,* the trial court precluded defense counsel from questioning a State's witness concerning several prior convictions, including two burglary convictions, a criminal conspiracy conviction, a drug violation and a conviction for failure to return a rental car. *Id.,* 2012-0689, p. 16, 123 So.3d at 330. While the Court agreed that jurors should have been apprised of these convictions, the Court, after "[c]onsidering all of the facts and evidence presented during the trial, . . . [found] that the guilty verdicts were unattributable" to the error. *Id.,* 2012-0689, p. 17, 123 So.3d at 330.

In the instant case, the evidence against defendant was significant. Two witnesses, Mashonda Johnson and Ms. Dillion, testified that defendant and the victims engaged in an argument and that minutes later shots were fired and the victims were discovered dead in their vehicle and defendant had fled the scene. Further, two witnesses, Mashonda Johnson and Ms. Williams, testified that the

defendant discussed the shootings, admitting, with Ms. Williams listening nearby, that he shot the victims. He also stated that he was going to resist if the police came to apprehend him in connection with the murders. The jurors knew about prior convictions on the part of all three, along with Ms. Dillion's drug use at the time of the shootings. Therefore, there has been no showing that the alleged false testimony, i.e., the State witnesses' failure to admit to all of their criminal convictions, could have affected the outcome of the trial.

**PRO SE ASSIGNMENT OF ERROR NUMBER 1 AND COUNSEL ASSIGNMENT OF ERROR NUMBER 2**

The defendant complains that he was unduly prejudiced by the prosecutor's repeated reference to hearsay and false evidence during opening statements. Specifically, he points to the State's claim, during its opening statement, that defendant shot the victims "in front of a whole bunch of people," when, in actuality, there were no witnesses to the shooting itself. Further, defendant complains that the prosecutor referred to Ms. Williams as a "known informant" and inferred that defendant had specifically informed Ms. Williams that he killed the victims. However, the prosecutor's representations were refuted by Ms. Williams who stated she was not an informant and who testified that she overheard defendant confess to the murders rather than hearing this information directly from the defendant. Defendant next complains that the prosecutor, during his opening statement, contended that Ms. Dillion did not "ask for anything" in exchange for her statement. Ms. Dillion, however, contradicted this statement, admitting that she unsuccessfully sought to have a charge dropped against her in exchange for her statement. Similarly, the prosecutor indicated that Ms. Dillion had seen the shooting; however, once again, this assertion was dispelled by Ms. Dillion's

14

testimony during which Ms. Dillion admitted she did not witness the shooting. The prosecutor, in his opening statement, also indicated that Mashonda Johnson had witnessed the argument. Again, however, the allegation was dispelled by the witness who stated that she only heard the defendant and the victims arguing. Additionally, defendant complains that in summing up his opening remarks, the prosecutor stated that three witnesses would testify that they heard defendant brag about committing the murders when, in actuality, only Ms. Williams stated that she overheard defendant admit to the killings. Again, however, the jurors heard the evidence; heard that only one witness, Ms. Williams, regarding defendant's admission to the murders.

The prosecutor also made inaccurate statements regarding what Ms. Journee saw, representing that she saw the argument, that she identified defendant and that she would testify. The prosecutor made these statements despite his knowledge that Ms. Journee had recanted her earlier statement, informing, in a later statement, that she "made it all up and was at a hotel at the time of the murder." As noted earlier, a prosecutor who questioned Journee on September 9, 2019, submitted a "Disclosure," a copy of which was provided to defense counsel as evidenced by the pertinent certificate of service, representing that Ms. Journee had "made it all up and was at a hotel at the time of the murder." However, like the other inaccurate statements, the fact that Journee recanted her earlier statement to Det. Kent, a fact of which defense counsel was aware, became apparent when Ms. Journee did not offer testimony at trial.

The defendant's final complaint regarding the prosecutor's opening statement stems from the State's reference to hearsay evidence, stating that Det. Kent "got numerous Crimestoppers tips in this case." Defense counsel lodged an

15

objection, which the trial court overruled, noting that the State was "not going into the contents of the tips…."

A review of the objectionable comments by the prosecutor reflects that, with the exception of the State's reference to Crimestoppers tips, defense counsel raised no objection, even though the "Disclosure" makes clear that defense counsel was aware that Ms. Journee had recanted her earlier statement. Further, once the witnesses had testified or, in Ms. Journee's case, had not offered testimony, defense counsel did not seek a mistrial based on the prosecutor's misleading statements about the evidence the state would introduce. Defendant's motion for new trial makes no mention of the opening statements. As such, La. C.Cr.P. art. 841 precludes review of the alleged objectionable comments by the prosecutor during his opening remarks. *See State v. Sullivan,* 97-1037, p. 14 (La. App. 4 Cir. 2/24/99), 729 So.2d 1101, 1108 (failure to object precluded appellate review of alleged objectionable statements during opening statements and closing arguments).

The statements of the prosecutor were refuted by the witnesses' subsequent testimony or lack thereof, evidence which the jury heard. Further, the trial court, prior to the State's opening statement, instructed the jury that the opening statements were not evidence. As noted above, the evidence against defendant was strong. Two witnesses, Mashonda Johnson and Ms. Dillion, who were well-acquainted with both the victims and defendant, testified to hearing the parties argue then, minutes thereafter, hearing gunshots. Seconds after the gunshots had ceased, they went outside and found the victims' bodies in their vehicle, but defendant had fled the scene. Further, a third witness, Ms. Williams, testified that she overheard defendant admit to the murders. The defendant also complains

16

about alleged hearsay testimony elicited by the State from Det. Kent. He stated that Ms. Williams did not ask for anything in exchange for her testimony and Det. Kent offered testimony as to what Ms. Williams had told him about who had committed the murders. Defense counsel did object to said testimony on the basis that it was hearsay but the trial court overruled the objection, though cautioned Det. Kent not to "repeat what someone said." Further, Det. Kent offered evidence as to what Mr. Bradley, who did not testify, stated to him, i.e., that Mr. Bradley corroborated Williams' statement. Again, defense counsel objected, arguing that whether or not Bradley corroborated Ms. Williams' statement was a matter for the jury to decide but the trial court overruled the objection. Additionally, Det. Kent testified regarding what Mashonda Johnson and Ms. Journee told him, i.e., that they had seen defendant at the scene of the crime and that defendant later bragged about the shootings. Defense counsel lodged no objection to Det. Kent's testimony in this regard. During Det. Kent's direct examination, the prosecutor also again referred to Crimestopper tips received, but no specifics were given regarding what the tips revealed. Specifically, the trial colloquy reflects the following brief exchange:

> Q. Now, Detective, in addition to all the witnesses you interviewed in this case, there are also a number of Crimestoppers tips, correct?

> A. Correct.

Defense counsel raised no objection to the above exchange.

As an initial matter, to the extent defense counsel at trial failed to object to the testimony which defendant contends was hearsay, or objected to said testimony on grounds other than hearsay, such an objection is waived on appeal. "An irregularity or error cannot be complained of after verdict unless it was objected to

17

at the time of occurrence. La. C.Cr.P. art. 841…. The defense is limited on appeal to those grounds articulated at trial." *State v. Keys,* 2012-1177, p. 13 (La. App. 4 Cir. 9/4/13), 125 So.3d 19, 31 (citation omitted).

Additionally hearsay rules do not prohibit testimony elicited to explain an officer's course of investigation. As the Court explained in *State v. Clanton,* 2019-0316, p. 8 (La. App. 4 Cir. 11/6/19), 285 So.3d 31, 38 (citation and quotation omitted), "[t]he testimony of a police officer may encompass information provided by another individual without constituting hearsay, if it is offered to explain the course of the police investigation and the steps leading to the defendant's arrest."

Det. Kent's testimony as to whether Ms. Williams asked for anything in exchange for her statement was not erroneous. Ms. Williams, on re-direct examination, testified that she was not promised leniency, in connection with her prior convictions, in exchange for her testimony. As to the admission of evidence elicited from Det. Kent regarding what Ms. Williams, Mashonda Johnson, Ms. Journee and Mr. Bradley told him, along with Det. Kent's reference to Crimestopper tips, even if hearsay, it was harmless. *See State v. Wille,* 559 So.2d 1321, 1332 (La. 1990) (admission of hearsay evidence is subject to a harmless error analysis).

In engaging in a harmless error analysis, factors to consider include the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of corroborating evidence, the extent of cross-examination permitted, and overall strength of the state's case. *Id.* During cross-examination, defendant was free to question Ms. Williams regarding what she stated to Det. Kent. Any hearsay evidence from Det. Kent in this regard was harmless. The same is true with respect to Mashonda Johnson who also offered testimony at trial.

An examination of her direct examination testimony reflects that she admitted that she did not see defendant at the crime scene, stating that he had fled by the time she went outside after hearing the gunshots. Further, Mashonda Johnson never testified that she had heard defendant state that he had shot the victims. To the extent defendant sought to point out that Mashonda Johnson's testimony in this regard was contrary to what Det. Kent represented that she had told the officer, defense counsel had opportunity to do so on cross-examination.

As for Mr. Bradley and Ms. Journee, neither of whom testified at trial, their alleged statements were merely cumulative of Ms. Williams' testimony and Mashonda Johnson's testimony, respectively. Det. Kent stated that Mr. Bradley corroborated Ms. Williams' testimony and Ms. Journee corroborated Mashonda Johnson's testimony. The fact that Det. Kent's testimony, as to what Mashonda Johnson said, was refuted by her actual testimony, likewise undermined the veracity of what Ms. Journee allegedly told Det. Kent.

As noted above, the State's case against defendant was strong. Both Ms. Dillion and Mashonda Johnson, who knew defendant and the victims well, testified that they heard the parties quarrelling then, minutes later, heard gunshots. When they went outside to investigate, they found the victims dead in their vehicle and found that defendant was no longer at the scene. Ms. Williams offered testimony to the effect that defendant subsequently admitted to committing the murders.

The admission of Det. Kent's alleged hearsay testimony was harmless in light of the fact that two of the alleged hearsay statements came from Ms. Williams and Mashonda Johnson, both of whom testified at trial; Det. Kent's alleged hearsay statements from Mr. Bradley and Ms. Journee were merely cumulative of Ms.

19

Williams' and Mashonda Johnson's testimony, respectively, and the State's other evidence of defendant's guilt was overwhelming.

**PRO SE ASSIGNMENT OF ERROR NUMBER 2**

The defendant complains that the prosecutor, during closing arguments, improperly stated that jurors should not let defendant get into their neighborhoods (by finding him guilty) and that the State would have done everything in its power, even if it meant bringing them to court in shackles, to have witnesses at trial to offer testimony against defendant. Defendant, however, does not specify what portions of the closing arguments he finds objectionable. A review of the prosecution's closing arguments reflects that, with respect to allowing defendant to return to the streets of the city, the prosecutor stated:

> MR. NAPOLI [prosecutor]: And make no mistake about it, this isn't just about it, this isn't just about Josh[ua] and Rudy, because when you return your verdict, he doesn't just go back into a vacuum, all right? He goes back into your city; he goes back into the 7th Ward. He goes back on Pauger
>
> MR. BROWN [defense counsel]: Objection, Your Honor.
>
> THE COURT: Counsel, your objection is noted for the record. This is closing argument.

As for remarks regarding coercing witnesses to testify against defendant, even if it meant bringing them to court in shackles, the prosecutor stated:

> MR. NAPOLI: She [Mashonda] was absolutely terrified to get on that stand. The only reason we were able to produce her is because of that probation hold. Mr. Fiol [defense counsel] has implied to you that … [i]f it weren't for that probation hold, the State would have arrested her another way. Let me make something perfectly clear. I would have done anything, and everything, to get her before you if it meant arresting her, dragging her in here kicking and screaming, I would have done it because her testimony was compelling.

Prosecutors are afforded wide latitude when it comes to closing arguments. *See State v. Draughn,* 2005-1825, p. 44 (La. 1/17/07), 950 So.2d 583, 614, *cert.*

20

*denied,* 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The trial judge has broad discretion in controlling the scope of closing arguments, and an appellate court will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. *See State v. Vansant,* 2014-1705, p. 6 (La. App. 1 Cir. 4/24/15), 170 So.3d 1059, 1063, (citing *State v. Prestridge,* 399 So.2d 564, 580 (La. 1981); *Draughn,* 950 So.2d at 614).

In this case, there was nothing improper regarding the above remarks on the part of the prosecutor. The prosecutor did not make any false statements as if the jury returned a not guilty verdict, defendant would have been released. As for the State's determination to have witnesses, in particular, a witness who was currently incarcerated, testify, that was no surprise to jurors. Jurors were made aware of the fact that Mashonda Johnson, at the time of defendant's trial, was in custody. That the prosecutor emphasized this point, noting that he would have brought the witness in "kicking and screaming" if necessary, did not prejudice defendant and did not influence the jury or contribute to its verdict. The instant claim is without merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 3**

Defendant contends that the State used illegally seized evidence, i.e., the murder weapon, from another case to convict him. Members of the gang unit with the New Orleans Police Department recovered the weapon. That the seizure was made during an unrelated investigation is irrelevant to its introduction into evidence in the instant matter. As the State notes, defendant, in his pro se "brief," cites no authority to the contrary. Further, defendant did not move to suppress the evidence.

Defendant's complaint that the State introduced a "tainted disc" of his jailhouse telephone call to procure his conviction is likewise without merit. A review of the disc reveals no sabotage and defendant points to no defects in the chain of custody. While the voices were low and difficult to discern, the disc was not "tainted." That defendant may not have liked what was recorded does not render the evidence inadmissible. Further, a review of Jim Huey's testimony, pursuant to which the jailhouse call was introduced into evidence, reflects that no objection was raised to the introduction of the disc on which the telephone call was recorded.

**PRO SE ASSIGNMENT OF ERROR NUMBERS 4 AND 5**

Though some are difficult to discern, defendant sets forth a litany of reasons why his trial counsel was allegedly ineffective: 1) failure to object to improper argument and hearsay testimony;[4] 2) failure to assert defendant's right to a speedy trial; 3) failure to consult with him, leading defendant to seek to have counsel removed from his case; 4) failure to challenge the composition of the jury; 5) failure to move to suppress illegally obtained evidence, i.e., the murder weapon; 6) failure to raise or properly present various defenses; 7) the authorization of "his assistan[t] who just got on the case to make open[ing] argument"; 8) failure to listen to defendant in making strategic decisions; 9) failure to file for bill of particulars and failure to file for preliminary hearing; 10) failure to pursue a meritorious motion to quash and for a dismissal and instead moving for a continuance. In connection with the above claims, defendant requests an evidentiary hearing so he can prove his counsel's incompetence.

---

[4] This claim was also raised by counsel and, as noted above, the claim is moot as the alleged deficiencies were addressed on the merits and were deemed harmless errors.

22

Generally, a claim of ineffective assistance of counsel[5] is properly raised in a post-conviction proceeding before the district court. *Id.,* 2012-0685, p. 16, 120 So.3d at 882. As the Louisiana Supreme Court explained, the reasoning behind this general rule is that bringing the claim in a post-conviction proceeding before the district court "enables the district judge … to order a full evidentiary hearing on the matter." *State v. Barnes,* 365 So.2d 1282, 1285 (La. 1978); *see also State v. Brown,* 384 So.2d 983 (La. 1980) (per curiam). In this case, defendant admits an evidentiary hearing is needed so that he can prove his counsel's incompetence.

---

[5] As a substantive matter:

> Ineffective assistance of counsel claims are reviewed under the two-part test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *State v. Rubens,* 2010–1114, pp. 58–59 (La. App. 4 Cir. 11/30/11), 83 So.3d 30, 66–67, *writ denied,* 2012–0374 (La.5/25/12), 90 So.3d 410, *writ denied, State ex rel. Rubens v. State,* 2012–0399 (La.10/12/12), 99 So.3d 37, *cert. denied, Rubens v. Louisiana,* 568 U.S. 1236, 133 S.Ct. 1595, 185 L.Ed.2d 591 (2013).
>
> In *Rubens,* this Court discussed the *Strickland* two-part test relating to an ineffective assistance of counsel claim stating that the defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. *State v. Miller,* 2000–0218, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 104, 111; *State v. Sparrow,* 612 So.2d 191, 199 (La.App. 4th Cir.1992).

*State v. Mercadel*, 2012-0685, pp. 16-17 (La. App. 4 Cir. 7/24/13), 120 So. 3d 872, 882–883, *writ denied,* 2013-1995 (La. 2/21/14), 133 So. 3d 681.

**PRO SE ASSIGNMENT OF ERROR NUMBER SIX**

Finally, defendant argues that as an African-American, under the "Moorish America Zodiac Constitution," he was not subject to the district court's jurisdiction.

In *State v. Williams,* 2016-1192, p. 6 n. 11, (La. App. 4 Cir. 10/18/17), 316 So.3d 1145, 1151 n. 11, this Court specifically rejected such an argument, noting that "the United States does not recognize the Moorish Nation as a sovereign state."

**CONCLUSION**

For the above and forgoing reasons, we affirm the defendant's conviction and sentence.

**AFFIRMED**